MOORE and husband, Appellants, v. RELISH and another, Respondents.

*No. 257. Argued January 4, 1972.—Decided February 1, 1972.*
(Also reported in 193 N. W. 2d 691.)

For the appellants there was a brief by *Jenswold, Studt, Hanson, Clark & Kaufmann* and *Robert R. Studt,* all of Madison, and oral argument by *Robert R. Studt.*

For the respondents there was a brief by *Gibbs, Roper & Fifield* and *John R. Hoaglund, Jr.,* all of Milwaukee, and oral argument by *Mr. Hoaglund.*

HEFFERNAN, J.   Cheryl Moore was a young married woman twenty-six years of age and was employed as a recreational therapist at the Central State Colony at

Madison, Wisconsin. She began riding lessons and basic jumping lessons in 1965. During 1965 she had weekly one-half hour lessons for a period of six or seven months, and in 1966 she continued her lessons for an additional four months. In 1967 she had an additional nine months of instruction and testified that she was taking two and one-half foot jumps in 1967. In 1968 she took riding and jumping lessons at the Lancer Stables owned by the defendant St. John's Military Academy and under the supervision of its instructor, Eli Daniel Relish. She acknowledged that, before going to the outdoor jumps, she had taken three and one-half foot jumps.

At the time of the accident, Cheryl Moore was riding a thoroughbred mare named "In Bondage." She stated she liked the horse and had ridden it at least six to 10 times before the day of the accident. There was testimony that the mare was a "school horse, everybody rode her." During the summer, children aged nine to seventeen rode and jumped the mare regularly. There was evidence that the mare was high-strung and sometimes "rushed her fences." The instructor testified she liked to jump. He referred to her as a "consistent horse over a four foot fence."

On the day of the accident, August 3, 1968, Cheryl's lessons were given in an outdoor oval ring. The first circuit of the course was made without incident. On the second circuit of the course, Cheryl attempted to take an "in-and-out" jump. This consisted of two barriers 21 feet apart. Although the height of these barriers was disputed, they were at either three or three and one-half feet. Cheryl testified that "In Bondage" "barrelled through" the first fence and stopped in front of the second. She felt herself falling to the right of the horse. When she was almost out of the saddle, the horse attempted to jump the second barrier. She was thrown to the ground and sustained a fracture of the left tibia. The

injury required extensive hospitalization and resulted, it was testified, in permanent disability.

The plaintiffs attempted to show that the defendants were negligent in failing to provide a proper mount for a rider of Cheryl's experience. A well-qualified expert testifying on behalf of the plaintiffs, stated that a rider of Cheryl's capabilities should not have been given instruction on a high-strung thoroughbred horse. Defendants' expert testified that, on the basis of Cheryl's experience and training, the mount was appropriate and she should have had no trouble in taking the jumps on this "old school horse."

The plaintiffs also attempted to show that the riding master, Relish, was negligent in his conduct at the time of the accident. There was testimony that, to get a horse to jump when it balked at a barrier, the instructor would approach it from the rear to encourage it to jump. There was testimony that at the time the horse balked at the second barrier, Relish was to the side and to the rear of the horse, and when he saw Cheryl slipping from the horse, he approached it rapidly. The plaintiffs' expert witness testified that, under the circumstances, Relish's approach to the horse was unreasonable. On the other hand, Relish testified that he went to help Cheryl when he saw she was in trouble and that he was not yelling or waving his hands to encourage the horse to jump. Defendants' expert testified that the riding master's actions were reasonable under the circumstances, because the rider was in trouble.

The testimony became a battle of the experts. Both plaintiffs' and defendants' experts were highly qualified. The defendants' principal witness had over fifty years of experience in handling horses, including giving jumping instructions. The plaintiffs' expert was an expert horseman who had won several state and national championships and had qualified for the Unit-

ed States Olympic jumping team. He was a recognized judge of horse shows and jumping events. The experts even disagreed as to the effect of Cheryl's attempt to dismount from the right side of the horse. Defendants' witness testified that dismounting from the right side would confuse the horse. The plaintiffs' expert stated that it made no difference from which side a dismount was made.

It is apparent that the jury was obliged to make its choice between these diametrically opposed views. On the basis of the disputed testimony they could have concluded that Cheryl was negligent and that the riding stable was not, or that the riding stable was negligent and that Cheryl was not. They could also have concluded that both the plaintiff Cheryl and the defendants were negligent and apportioned the negligence between them. They chose an additional alternative—that neither the plaintiff nor the defendants were negligent at the time and place of the accident. It is apparent that such finding could properly have been made on the basis of the evidence. There was credible evidence to show that neither Cheryl nor the Lancer Stables and its employees were negligent. In the absence of error in the course of the trial, we must conclude that it was within the province of the jury to reach this conclusion and that such conclusion was based upon credible evidence of record.

On this appeal the plaintiffs contend that the court's instructions to the jury were in error. The instruction given was the standard ordinary-negligence instruction. The court instructed that ordinary care "means that degree of care and caution which a person of ordinary intelligence and prudence usually exercises in a like or similar situation . . . a person is required to take into

account such of the surrounding circumstances as would be taken into account by a reasonably prudent person, and possess such knowledge as is possessed by an ordinarily reasonable person, and to use such judgment and discretion as is exercised by persons of reasonable intelligence and judgment under the same or similar circumstances."

Plaintiffs object to this instruction because, they contend, it did not inform the jury of the duty placed upon the defendants to know the propensities of the animal, it gave no instruction as to the duty of the riding master to a pupil, and it failed to take into consideration what the plaintiffs refer to as a bailor-bailee relationship between the stable and the plaintiff.

We conclude as a matter of law on the undisputed facts that the relationship was not that of bailor-bailee; and special rules, if any, determining liability between parties where such a relationship exists are inappropriate here. A bailment arises when the possession of a chattel is temporarily transferred but the general title remains in the hands of the original owner. Implicit in the bailment relationship is that the general titleholder be out of possession of the chattel and the bailee be in a position to exercise all possessory rights. *See generally,* 8 Am. Jur. 2d, *Bailments,* p. 905 *et seq.* It is apparent that such relationship did not exist in the instant case. The horse, "In Bondage," was on the riding stable's premises, and it and its rider were under the direct supervision of the riding master. The situation is not unlike one in which a person taking driving lessons operates a vehicle under the supervision of an instructor. It can hardly be contended that a limited right of management and control afforded by this relationship is the equivalent of a bailment. We should, however, point out that, even in cases where a true bailment was thought to have existed, the

bailor is held only to a standard of ordinary care. *Vaningan v. Mueller* (1932), 208 Wis. 527, 243 N. W. 419; *Smith v. Pabst* (1940), 233 Wis. 489, 288 N. W. 780.

Plaintiffs also contend that it was error to fail to instruct that the duty of the defendant Relish was something more than ordinary care. They rely on flying-instruction cases wherein the duty of the instructor has been held to be "the highest degree of care consistent with the practical operation of the plane." We doubt that, within the context of Wisconsin cases, such responsibility would be framed as being other than that of ordinary care under all the circumstances. In the *Pabst Case, supra,* which involved a riding accident, the plaintiff was also under instruction, and we held the duty was simply one of ordinary care.

It should also be pointed out that the instruction requested by the plaintiffs referring to the standard of care to be exercised by Relish was clearly in error. Plaintiffs requested the instruction:

". . . if he knew such disposition to be unstable, or if he in the exercise of reasonable care, should have known the disposition of the horse and failed to do so, then he is liable to the plaintiff for her injuries . . . ."

We pointed out in *Pecor v. Home Indemnity Co.* (1940), 234 Wis. 407, 419, 291 N. W. 313, that an instruction which apprises the jury of the effect of the answer is improper.

All of the points raised by the plaintiffs in urging that different instructions should have been given are highly relevant. All of the elements of negligence which plaintiffs contend could have been considered by the jury only under their version of the instructions should have been considered by the jury. The question, then, is whether the instructions as given were broad enough to permit the jury to consider the points urged by the plaintiffs. We are satisfied that they were.

The evidence permitted the jury to make the determination of whether the propensities of the horse were such that the instructor in the exercise of ordinary care should have permitted a rider of Cheryl's capabilities to ride it. The evidence permitted the jury to consider whether it was negligence for an instructor of Relish's experience and training to have permitted Cheryl to have taken the jumps which he laid out for her. The evidence permitted the jury to determine whether or not Relish exercised ordinary care under the circumstances when he approached the horse after it was apparent that Cheryl Moore was in difficulty. The instruction of the court that ordinary care "means that degree of care and caution which a person of ordinary intelligence and prudence usually exercises in a like or similar situation" gave the jury the opportunity to consider in full all the factors which the plaintiffs contend should have been considered. Under the instructions the jury was permitted to consider all of the evidence, and on the basis of that evidence it concluded that the Lancer Stables and its riding master, Relish, had exercised ordinary care under all the facts and circumstances revealed to them, and that the defendants were not negligent. The instructions were sufficient.

As the recitation of the facts reveals, there was evidence in abundance from which the jury could reasonably have concluded that neither Cheryl Moore nor the defendants were negligent. The trial judge reviewed the testimony and concluded that there was substantial credible evidence in the record to support the jury's answers.

In *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48, we said:

". . . we must judge the jury verdict in the light of the familiar rules that (1) a jury verdict will not be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings, (2) this is particularly true when the

verdict has the blessing of the trial court, and (3) the evidence is to be viewed in the light most favorable to the verdict."

The record clearly reveals evidence, when considered in the light most favorable to the verdict, that would have permitted the jury to find neither party negligent.

Plaintiffs also argue briefly that this court should invoke its discretionary power under sec. 251.09, Stats., and reverse and order a new trial in the interest of justice. We have stated that our discretionary power to reverse a case will not be exercised unless we are convinced that there has been a probable miscarriage of justice when the case is viewed as a whole. *Rodenbeck v. American Mut. Liability Ins. Co.* (1971), 52 Wis. 2d 682, 190 N. W. 2d 917.

In this case the issues were well and ably tried. The jury made a difficult choice, a choice based upon evidence properly placed in the record. We cannot conclude that justice has miscarried. We can only reiterate the sentiments of the court in *Smith v. Pabst, supra,* page 499, wherein this court in sustaining a directed verdict for the defendant therein, said:

"While deploring the unfortunate accident, as the trial court doubtless did, we can see no escape from the conclusion that under the established law, the verdict was properly . . . in favor of the defendant."

*By the Court.*—Judgment affirmed.