UNITED STATES of America,
Plaintiff,

v.

Henry O. OKOTH, Defendant.

No. 01–10016–01–JTM.

United States District Court,
D. Kansas.

Oct. 24, 2001.

Cyd K. Gilman, Wichita, KS, for Henry O. Okoth.

Alan G. Metzger, Office of United States Attorney, Wichita, KS, for U.S.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on defendant's motion to suppress any and all evidence seized from the 1995 Toyota Avalon searched by authorities on January 15, 2001, including, but not limited to a briefcase, suitcase, computer, and their contents, any and all statements made by defendant on that same date after the search of the vehicle, and all evidence obtained from a search of the computer found in the vehicle pursuant to a federal search warrant. The motion is fully briefed and the court conducted an evidentiary hearing in this matter on October 22, 2001. Having fully considered all of the evidence and arguments, the court finds that defendant's motion to suppress is denied.

## I. Factual Background

On December 20, 2000, a black male, identifying himself as Daniel M. Ngandu, entered a contract to purchase a 1995 Toyota Avalon from Stevens Motors in Wichita, Kansas. Ngandu provided Stevens Motors with a check for $2,000 as a down payment on the automobile. Ngandu also received a loan from Stevens Motors' financing agent in the amount of $10,585.10. Ngandu's check was purportedly issued against the account of John Lukogo at a

Bank One in "Greesly,"[1] Colorado. Ngandu informed a Stevens Motors' sales representative that Lukogo was assisting him in the purchase of the vehicle.

After completing the sales contract, a credit application, and providing the $2,000 check, Ngandu took possession of the vehicle. A few days thereafter, Ngandu's down payment check was returned to Stevens Motors as a fraudulent draft as it was issued against a nonexistent account. Stevens Motors subsequently became aware that one of its employees had given Ngandu a ride to 1609 E. Tulsa, Wichita, Kansas. Thus, on January 15, 2001, Stevens Motors sent two of its employees, Tommy Sawaged and Bret Parham, to that address in search of the 1995 Toyota. Upon arrival, Sawaged and Parham witnessed defendant drive the subject vehicle into the driveway of 1609 E. Tulsa and thereafter enter the residence. Sawaged recognized defendant as the same individual who provided the fraudulent check under the name of Daniel Ngandu.

Sawaged and Parham telephoned the Wichita Police Department to obtain assistance in repossessing the vehicle. While they were awaiting the arrival of the police, defendant exited the residence and entered the vehicle. Sawaged and Parham immediately blocked egress from the driveway with their own vehicle. Defendant then exited the 1995 Toyota. Parham seized the key to the car from defendant's hand and told him that the police were en route to the area. Defendant fled the area and was subsequently found by Wichita Police Officer Arterburn sitting on the east bank of the Arkansas River. Officer Arterburn approached defendant and requested identification. Defendant produced a Colorado identification card bearing the name of Lawrence Kibuka. Offi-

---

1. Testimony at the hearing of this matter indicates that Greesly, Colorado does not exist.

cer Arterburn did not believe that the picture on the identification card resembled defendant, but defendant insisted it was his photograph. The police then took defendant back to 1609 E. Tulsa. Sawaged identified defendant as the person he knew as Daniel Ngandu and the person who had passed the fraudulent check. At some point during this initial interaction with the police, defendant volunteered another identification card, an Alien Registration card, bearing the name of Amisi Luwanga. Thus, only two fraudulent items were found on defendant's person: a Colorado identification card and an Alien Registration card. Police officers transported defendant to City Hall.

Once at City Hall, Detective Amussen of the Wichita Police Department interviewed defendant. According to Detective Amussen, defendant identified himself as Lawrence Kibuka during this interview. After answering a few personal history questions, defendant invoked his Miranda rights and refused to give a further statement.

Subsequently, Scott Bechel of the United States Immigration and Naturalization Service interviewed defendant. During this interview, defendant apparently conceded that his real name was Henry Odoi Okoth.

While the police were transporting defendant to City Hall, Tommy Sawaged, after identifying himself as a manager at Stevens Motors, gave police oral and written consent to search the 1995 Toyota Avalon. During the search of the vehicle's trunk area, police found a briefcase containing several payroll type checks and other fraudulent identification and access cards, including: a Ugandan passport issued to Henry Odoi Okoth; two Social Security cards, one issued to Henry Odoi Okoth and one to Okoth Henry Odoi; three counterfeit Kansas Identification cards; several certificates of citizenship, and a counterfeit Kansas Drivers License. Police also found a suitcase and a computer in the 1995 Toyota's trunk.

Several slight inconsistencies regarding the time frame of Sawaged's consent were illuminated during the evidentiary hearing. To begin with, the written consent was completed seven minutes after the search commenced. Further, Wichita Police Officer Mathew Little testified that the Stevens Motors' employees gave the oral and written consent contemporaneously. This would suggest that the consent postdated the police search of the vehicle. However, the clear weight of the testimony indicates that the oral and written consent were not contemporaneous. Both Tommy Sawaged and Officer Arterburn testified that the oral consent was given before the search and that the written consent to search was completed some time later after the search had already commenced. Both testified unequivocally that oral consent was given before the search commenced and the court finds the weight of the evidence supports such a construction of the events.

After reviewing the findings of the local police and INS agents, Secret Service Agent Philip Smith applied for a search warrant to search the computer seized from the 1995 Toyota. In his affidavit, Smith described the two identification documents found on defendant's person and further described the items found in the briefcase seized from the vehicle. Agent Smith further stated that, in his experience, a computer such as the one seized in the vehicle search was of a type capable of producing counterfeit identification and access cards and that several of the documents found in defendant's possession were clearly computer generated, which led Smith to believe that the defendant utilized the computer in the production of counterfeit documents. Magistrate Judge

Karen Humphreys issued a warrant to search the computer on February 2, 2001. Authorities then seized the contents of the computer revealing a significant amount of probative information.

## II. Analysis and Discussion

The court initially notes that defendant does not contest the legality of the seizure of evidence from his person. Indeed, defendant cannot seriously dispute but that such seizures were appropriate incidences to defendant's lawful arrest. When Tommy Sawaged identified defendant as the person who passed a fraudulent check, the police were justified in arresting defendant. The discovery of counterfeit identification documents on the defendant's person occurred as a legal incident to his lawful arrest. *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) ("[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area.").

At the hearing, counsel for defendant acknowledged that defendant did not have standing to contest the search of the 1995 Toyota Avalon, but had asserted standing previously. The court will address the issue of standing to clarify its conclusions as to the other issues defendant previously raised. The government contends that defendant does not have standing to object to the search of the vehicle because he did not possess a legitimate expectation of privacy in an automobile in which he had no legitimate ownership interest. Alternatively, the government argues that the search was appropriate in light of Sawaged's consent and Stevens Motors's interest in the vehicle.

■ In considering whether defendant has standing to object to the search of the 1995 Toyota, the court must determine whether he had a reasonable expectation of privacy in the vehicle. "Whether a driver's privacy interest in an automobile is reasonable depends on the driver's lawful possession of the vehicle." *United States v. Soto,* 988 F.2d 1548, 1552 (10th Cir. 1993). "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990). Here, defendant did not have lawful possession of the vehicle. Defendant paid the down payment on the 1995 Toyota with a fraudulent check and did not thereby become the lawful owner of the vehicle. This is not the type of case where a bank simply returned a prospective purchaser's check for insufficient funds. Instead, defendant utilized a fraudulent check issued against a nonexistent account to effectuate the purchase of the vehicle. Use of a counterfeit or fraudulent check cannot transfer a legitimate possessory interest to the purported buyer. Because defendant was not in lawful possession of the vehicle and clearly did not have the rightful owner's permission to use the vehicle, he does not have standing to object to the search of the vehicle.

■ Alternatively, Sawaged's consent, as an authorized representative of the rightful owner of the vehicle, provides a legal basis for the search of the 1995 Toyota. Defendant does not dispute that Sawaged's consent was voluntary, but instead argues that Sawaged lacked authority to consent. While the Tenth Circuit has never directly addressed this situation, the court sees no reason not to apply the *Matlock* standard of "apparent equal right to use or occupy the property" in the vehicle context. *See United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d

242 (1973). Here, Sawaged and Parham informed the police of defendant's use of a fraudulent check to purchase the vehicle in question and were presented with a consenting individual whom the police reasonably believed had authority to consent to a search on behalf of the true owner of the vehicle. The fact that the written waiver signed by Sawaged did not reflect his representative capacity is of no consequence. The police reasonably understood that he was consenting in his representative capacity on behalf of the true owner, Stevens Motors. Further, the police reasonably believed that he was a proper representative of the lawful owner and such a reasonable belief in the consentor's authority is sufficient to confer legality on the search. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The court thus finds that the search of the 1995 Toyota was legal in view of Sawaged's consent and the police's reasonable belief in his authority to provide such consent.

■ While the search of the vehicle was proper, the court must also consider the legality of the search of the closed briefcase that was found in the vehicle.[2] Even though defendant did not have a legitimate expectation of privacy in the vehicle, he retained an expectation of privacy in his closed briefcase within the vehicle. *See United States v. Edwards,* 242 F.3d 928, 937 (10th Cir.2001) (holding that lack of expectation of privacy in vehicle does not impact a defendant's standing to challenge the search of closed bags owned by defendant within the vehicle). Defendant evidenced a subjective expectation of privacy in his briefcase by claiming ownership of the briefcase, closing it and maintaining it in a secured location even if he did not possess an expectation of privacy in that

location. Because defendant had an expectation of privacy in the briefcase, the court finds that defendant possesses standing to challenge its search.

■ The government contends that the search of defendant's briefcase was a proper inventory search. An inventory search conducted as part of regular procedures, and for administrative rather than investigatory purposes, does not require a warrant. *See United States v. Haro–Salcedo,* 107 F.3d 769, 772–73 (10th Cir.1997). To be justified, an inventory search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability. *See South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (upholding inventory search where "there is no suggestion whatever that this standard procedure ... was a pretext concealing an investigatory police motive").

At the hearing of this matter, police officers presented some contradictory evidence as to the true motivations of their search of the briefcase at 1609 E. Tulsa. For instance, Officer Arterburn testified that he opened the bag at the scene in order to insure that the briefcase did not contain any dangerous or hazardous materials. Nonetheless, Arterburn testified, with some degree of specificity, regarding the contents of the briefcase, including the type and number of fraudulent identification and access cards. This would suggest a more detailed search than one necessary to secure the bag for safe transport. Additionally, Officer Little testified that the "most important" purpose of the initial search of the briefcase was identification of the suspect. Both officers testified as to

---

**2.** The court recognizes that defendant's suitcase was similarly searched. The analysis is the same for that relative to the briefcase.

However, the court will not further discuss the suitcase, as no relevant evidence was located therein.

the need to protect the police department against liability and to protect defendant's property. As noted in *Haro–Salcedo*, the inventory search exception is designed to effect three purposes: protection of the owner's property, protection of the police against claims of lost or stolen property, and protection of the police from potential danger. *Id.* at 772–73. The court is thus faced with testimony placing the initial search of the briefcase squarely within the inventory search exception to the warrant requirement and with conflicting testimony indicating that the primary purpose of the initial search was investigatory in nature. The officer who actually searched the briefcase, Officer Arterburn, testified that he simply looked in the briefcase to insure safe transport pending a full inventory search. The court finds Arterburn's testimony to be highly credible and in keeping with objectively reasonable police activity. The court thus finds that the preliminary on-scene search was a reasonable prelude to the full inventory search.

■ However, the question of the legality of the initial search is moot. The briefcase was located in an automobile which the police intended to immediately return to its rightful owner upon removal of defendant's personal effects. Police had placed defendant under arrest and transported him to the county detention center for booking. The police thus had no option but to take the defendant's property into custody and to take his belongings to the police station for safekeeping. It is uncontested that written Wichita Police Department policy requires that police must inventory and place in safekeeping any personal property taken from a detained individual. The court finds that the police conducted an appropriate and legal inventory search of defendant's briefcase in accordance with written procedure. Because the police had no option but to take defendant's belongings into custody, an inventory search was inevitable. Tenth Circuit law clearly holds that when officials would inevitably discover evidence through a proper inventory search, an earlier illegal search is irrelevant. As the circuit stated in *Haro–Salcedo*, "if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *Id.* at 773. The court thus finds that the inevitability of discovering evidence by lawful means removes any potential taint from evidence earlier discovered through illegal means.

■ Finally, the court finds that the search of defendant's computer and seizure of information therein was reasonable pursuant to the Fourth Amendment because the search was conducted pursuant to a valid warrant. The warrant in question is facially valid. A neutral and detached magistrate judge issued the warrant which particularly described the thing to be searched and the information to be seized. Defendant contends, however, that the warrant was not based on probable cause established from facts submitted to the magistrate judge through the Smith affidavit. The affidavit presented numerous facts to the magistrate judge in support of the warrant. Such information includes two counterfeit identification documents taken from defendant's person, the documents seized from defendant's briefcase, and Smith's experience in the area of computer generation of counterfeit identification and access documents. As noted above, the information found in the briefcase and recited in the affidavit was legally obtained by officials. However, even if police illegally obtained the contents of the briefcase, the search warrant would remain valid because the affidavit in support of the warrant contained sufficient supporting facts independent of information

located in the briefcase. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow,* 919 F.2d 1458, 1460 (10th Cir.1990) (citing *United States v. Karo,* 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984)).

The affidavit in this case, when stripped of the information obtained from the briefcase, provided sufficient probable cause to support issuance of the warrant. The affidavit indicated police had arrested defendant for obtaining a vehicle with a counterfeit check. It indicated that the following information was found on defendant's person: a counterfeit Colorado identification card and a counterfeit Alien Registration card. The affidavit further stated that the computer seized during the proper search of the vehicle was of the type utilized in making counterfeit identification and credit access cards. Additionally, Smith indicated that the items found on defendant's person had been computer generated, which further linked the computer to the commission of illegal activity. Given this information alone, the affidavit established probable cause to support the warrant. The court thus finds that the search of defendant's computer occurred pursuant to a valid warrant and was thus constitutional.